Kennedy D. Nate (14266)
**RAY QUINNEY & NEBEKER P.C.**
36 South State Street, Suite 1400
Post Office Box 45385
Salt Lake City, UT 84145-0385
Phone:  (801) 532-1500
knate@rqn.com

*Attorney for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| BRIAN DURYEA, individually and on behalf of all others similarly situated,<br><br>  Plaintiff,<br><br>vs.<br><br>RAWLINGS SPORTING GOODS COMPANY, INC., a Delaware corporation, with its principal place of business in St. Louis, Missouri,<br><br>  Defendant. | **COMPLAINT – CLASS ACTION**<br><br>Case No.<br>Judge:<br>Magistrate Judge: |

Pursuant to Rules 8, 15, and 23 of the Federal Rules of Civil Procedure, Plaintiff Brian Duryea ("Plaintiff"), by and through their counsel of record, RAY QUINNEY & NEBEKER, hereby submits this Complaint against RAWLINGS SPORTING GOODS COMPANY, Inc. ("Defendant") and as set forth herein.

### INTRODUCTION

1.     Defendant sells baseball and fastpitch bats under the brand names Rawlings, Easton, Combat, Miken, and Worth (collectively, the "Brands").

2.     Upon information and belief, Defendant markets and advertises the Brands by representing that these bats are certified for use under various governing standards.

3. Certification approval is required for the bats to be lawfully sold and used in organized leagues and games.

4. While certification rules vary by governing body, manufacturers generally obtain certification in one of two ways: by performance testing at approved certification laboratories, or by representing that a bat has not materially changed from a previously approved model and differs only in cosmetics, such as paint or name.

5. Defendant does not disclose to consumers whether its Bats were approved through performance testing or instead based on representations that the Bats had not materially changed from prior models.

6. Upon information and belief, Plaintiff has learned that Defendant marketed material and specific improvements to bat components to consumers while simultaneously representing to certifying bodies that the bats had changed only cosmetically.

7. A reasonable consumer would consider it important to know that a manufacturer denied material changes in its certification submissions while advertising those same changes to consumers as being improvements on the bat's performance.

8. Had that information been disclosed, Plaintiff would have paid less or not purchased the Bats at all.

9. Plaintiff contends that this half-truth marketing scheme extends across multiple governing bodies, bat lines, and Brands.

10. Because certification submissions and engineering change records are exclusively within Defendant's control, Plaintiff cannot determine pre-discovery whether any given model involved (i) false marketing claims, (ii) false or inconsistent certification representations, or (iii) both. Plaintiff therefore pleads these theories in the alternative pursuant to Rule 8(d)(2)–(3).

11.     Because Defendant keeps their certification submissions private and the certification mark does not disclose the pathway used, consumers cannot determine before purchase whether Defendant's performance claims are consistent with its representations to certifying bodies. Plaintiff intends to purchase certified bats from Defendant again but cannot rely on Defendant's performance or certification representations. Without corrective disclosure, future purchases would likely cause additional financial harm.

## BACKGROUND

12.     To be eligible for sanctioned play, non-wood bats must be certified under the rules of the applicable governing regimes.

13.     Those certification regimes include but are not limited to:

i.      Batted Ball Coefficient of Restitution ("BBCOR"), enforced by the National Federation of State High School Associations ("NFHS") and the National Collegiate Athletic Association ("NCAA") for high school and collegiate baseball.

ii.     United States Specialty Sports Association ("USSSA"), commonly required in youth travel baseball, high school fastpitch and many youth fastpitch leagues/tournaments.

iii.    USA Baseball Bat Standard ("USA Baseball"), the standard used for many youth baseball leagues, including Little League and other USA Baseball-bat-standard organizations.

14.     Though each governing body's rules differ in its specifics, they generally address and require limits on measurable performance characteristics of bats including a bat's weight, barrel size, and its ability to rebound ("trampoline") a ball.

15.    Bat manufacturers may obtain certification from these regimes through two pathways:

    i.    Testing Pathway. A manufacturer submits a bat model to an approved laboratory to confirm it meets the governing body's performance requirements. If the bat passes testing, the results are used to obtain certification approval.

    ii.    Cosmetic-Change Pathway. Under the governing bodies' rules, a bat that differs only in appearance from a previously certified model may be approved without new testing if the manufacturer represents that no physical, performance-affecting design changes were made. In such circumstances, certification relies on the prior model's test data rather than new performance testing..

16.    Regardless of how certification is obtained, approved bats are required to display the applicable certification mark on the bat's barrel, which signals league eligibility to consumers; absent manufacturer disclosure, consumers have no practical way to determine whether approval was issued via the Testing or Cosmetic-Change pathway.

17.    Below are examples of common certification marks:

 

18.    In short, approval based on cosmetic or no-change representations is limited to appearance-only updates and may rely on prior certification data, while approval based on testing

requires new laboratory testing. In either case, the same certification mark appears on the bat, and consumers cannot determine which approval pathway was used.

## THE PARTIES

19.     Plaintiff is an individual who resides in Davis County, Utah.

20.     Defendant is a Delaware corporation with its principal place of business in St. Louis, Missouri.

## JURISDICTION AND VENUE

21.     This Court has jurisdiction under 28 U.S.C. § 1332(d)(2). The aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, see § 1332(d)(6); the proposed Class contains at least 100 members; and minimal diversity exists because Plaintiff is a citizen of Utah and Defendant Rawlings Sporting Goods Company, Inc. is a citizen of Delaware (state of incorporation) and Missouri (principal place of business).

22.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1) & (2) because Defendant has sold hundreds (if not thousands) of bats in this District and has continuously conducted business here.

23.     This Court has specific personal jurisdiction over Defendant because Defendant has continuously marketed, sold, and distributed bats and other baseball equipment in this District, and a substantial part of the conduct giving rise to Plaintiff's claims occurred here.

## FACTUAL ALLEGATIONS

24.     As used herein, "Bats" means Defendant's baseball and fastpitch bat models sold under its Brands during the Class Period, including, by way of example and not limitation, the following representative models across certification regimes and model years:

i.   BBCOR: ICON (2024, 2025), CLOUT AI (2025), MACH AI (2025), ICON Pro Preferred (2025), Electric Unicorn (2025), MAV1 (2025), ROPE (2025), Alpha (2023)

ii.   USSSA: ICON (2024, 2025), Hype Fire (2025), MAV1 (2025), Encore (2023), Hype-Comp (2023)

iii.   USA: ICON USA (2025), Hype Fire (2025)

iv.   Fastpitch: Mantra 2.0, Mantra 3.0, Ghost Unlimited (2024), Ghost (2023)

25.   During the Class Period, Defendant's Bats generally retailed between $200 and $600, with multiple new model lines released each year in BBCOR, USSSA, USA Baseball, and Fastpitch.

26.   During the Class Period, Plaintiff purchased multiple Bats from authorized retailers.

27.   Specifically, Plaintiff purchased the following bats:

(a) BBCOR

(i)  2023 Easton Alpha ("Alpha-23"), around January 7, 2023.

(ii) 2024 Rawlings MACH AI ("MACH-24"), around October 9, 2023.

(iii)2024 Easton Rope ("ROPE-24"), around October 9, 2023.

(iv)2024 Easton MAV-1 ("MAV1-24"), around October 9, 2023.

(v) 2025 Easton MAV-1 ("MAV1-25"), around July 17, 2025.

(b) USSSA

(i)  2023 Easton Encore 2023 ("Encore-23"), around January 7, 2023.

(ii) 2023 Easton Hype Comp 2023 ("Hype-Comp-23"), around January 7, 2023.

(iii)2024 Rawlings ICON ("ICON-24"), around October 9, 2023.

(iv) 2025 Rawlings ICON Electric Unicorn ("ICON-25"), around July 22, 2024.

(c) Fastpitch

(i) 2023 Rawlings Mantra 2.0 ("Mantra-2"), on or around February 24, 2023.

(ii) 2023 Ghost Unlimited ("Ghost-U-23"), around February 24, 2023.

28.    In purchasing each of the above bats, Plaintiff relied on Defendant's marketing claims that the bats were materially improved over prior versions, and not merely updated in appearance.

29.    Defendant did not disclose the basis on which its bats were certified, including whether certification was obtained through performance testing or through merely cosmetic changes, meaning that Defendants represented that the bats had not materially changed.

30.    In the absence of any such disclosure, and faced with marketing describing material improvements to the construction and performance of the bats, Plaintiff reasonably believed that Defendant's representations to certifying bodies were consistent with its consumer-facing marketing claims.

31.    In January 2025, Plaintiff obtained records through a public records request to Washington State University showing that Defendant has, for some BBCOR bats, relied on a cosmetic or no-change certification process that permits approval without new testing, which is inconsistent with Defendant's public claims of material improvements. Upon information and belief, Defendant employs similar certification practices across its Brands and governing regimes.

32.    After Plaintiff notified Defendant of this issue in or around June 2025, Defendant has continued to market bats as redesigned or improved without disclosing the basis for certification across its Brands and model lines, leaving Plaintiff unable to determine whether current or future models are consistent with the advertised performance claims.

33.     As a result, Plaintiff faces a real and ongoing risk of overpaying for bats and being deprived of truthful information as he seeks to purchase bats for the 2026 season and beyond. Injunctive relief and corrective disclosure would remedy this harm.

### A.  2023 Rawlings Mantra 2.0

34.     In or around 2023, Defendant released the Rawlings Mantra 2.0 ("Mantra-2") Fastpitch.

35.     Defendant promoted the bat on its website, social media outlets, and upon information and belief, to its authorized retailers.

36.     Rawlings.com claimed Defendant "upgraded our highest-performing fastpitch bat ever to give you the Mantra 2.0"; the site also touted features like a "fully reconstructed F2 Collar," "ENHANCED Ultra-Light End Cap," and a "15% thinner barrel"; these updated features "created" purported improvements like "unmatched trampoline on contact," improvements to "flex and stiffness," an easier way to "whip this bat through the zone," and gain "accelerated swing speed."



**WHAT'S YOUR MANTRA?**

A mantra is a firmly-held statement or belief, repeated often to build your inner strength. Mantras are unique and powerful, and they drive us to be better as individuals and as teams every day. Inspired by these incredible mottos, we upgraded our highest-performing fastpitch bat ever to give you the Mantra 2.0.

discipline, and power with you to the plate. Crafted with an innovative three-step inner barrel, this bat perfectly balances swing speed and massive pop. Also, the 2023 Mantra features our thinnest outer barrel yet, creating unmatched trampoline on contact. The fully reconstructed F2 collar assembly creates the perfect harmony between flex and stiffness, and the ultra-light end cap makes it easy for any hitter to whip this bat through the zone.

To top it all off, the Mantra's knob is fitted with a concave opening compatible with a Blast Motion sensor, meaning you can get data on every swing whether you're in a game

 

(see https://www.rawlings.com/product/RFP3M10B-30.html, (last visited February 19, 2026).)

37.    JustBats.com (a major authorized retailer of Defendant) also touted that the Mantra 2.0 included a "fully Reconstructed F2 Collar Assembly" that now created a "perfect harmony between flex and stiffness."



(https://www.justbats.com/product/rawlings-mantra--10-fastpitch-softball-bat--rfp3m10/35843/ (last visited February 19, 2026).)

38.    Defendant's social media channels like YouTube also advertised an "improved" outer barrel that "Creates Unmatched Trampoline" as well as a "fully redesigned" collar.



(*See* https://www.youtube.com/watch?v=6S8SQcYuRJs, (last visited February 19, 2026).)

39.    While Defendant marketed the Mantra-2 as an improved fastpitch bat, Plaintiff is informed and believes that Defendant sought and/or maintained certification for the Mantra-2 without new performance testing by representing that the model was materially unchanged from a previously approved bat and involved no physical, performance-affecting design changes. The basis for certification is not publicly disclosed and is within Defendant's control.

40.    Changes to barrel wall thickness, collar assembly and handle flex are performance-affecting design changes within the meaning of the certification rules described above.

41.    Defendant did not disclose to Plaintiff or other consumers that, despite marketing the Mantra-2 as having material improvements, certifying bodies were told the Mantra-2 had not materially changed from a prior model.

42.    Defendant marketed and sold the Mantra-2 at a substantially higher price than its predecessor, the 2021 Mantra, from which it claimed the Mantra-2 was improved.



GLOVES   BATS   BALLS   HELMETS   CATCHER'S GEAR   BAGS   /

2023 Rawlings Mantra 2.0 Fastpitch Bat, -9, -10
$399.95

2021 Rawlings Mantra Fastpitch Bat, -9, -10
$399.95 $279.95

2023
$149

43.    Because Defendant withheld how certification was obtained and controlled all material-change records, Plaintiff could not determine before purchase whether Defendant's marketing claims conflicted with its certification representations. Had Plaintiff known that

Defendant represented the Mantra-2's performance as unchanged, Plaintiff would not have purchased the bat or would have paid less.

### B. Example: Rawlings ICONs

44.    Defendant's failure to disclose its certification representations is not limited to a single bat model, but reflects a broader practice applied across product lines.

45.    Beginning in or around late 2022, Defendant released a series of ICON-branded baseball bats across multiple certification regimes, including BBCOR, USSSA, and USA Baseball. These bats are released annually in multiple variations and model years (collectively, the "Icons") and are marketed as improved over prior versions.

46.    On information and belief, Defendant obtained certification for certain Icon models by representing to certifying bodies that those models had not materially changed from previously approved designs and differed only in cosmetic respects. The specific models and years for which Defendant relied on such representations are not publicly disclosed and are exclusively within Defendant's control.

47.    Defendant's marketing for Icon models included specific, performance-related claims, including the following:

> i.    USSSA 2024: marketed as featuring an "all new tapered, more flexible handle" designed to increase "swing speeds" and deliver "more force."

> The 2024 model features an all new tapered, more flexible handle to give players a better feel in the hands and more whip through the zone, increasing swing speeds and delivering more force. And, of course, the 2024 Icon features a stunning white-and-gold color design that will be the envy of any dugout where the Icon graces the bat rack.

(*See* https://www.rawlings.com/product/RUT4I.html, (last visited October 28, 2025).)

ii.  BBCOR 2025: marketed as "new and improved" and built with a "next-gen" carbon composite that "delivers performance…unlike any other BBCOR bat."



BBCOR baseball's premier composite bat is new & improved for 2025 -- the new Rawlings Icon is here and ready to take over the game. Thanks to our specially engineered In/Tense Carbon Composite material, the Icon delivers performance and consistency unlike any other composite BBCOR bat in the field.

IN/TENSE CARBON COMPOSITE
Next-gen carbon composite maximizes barrel size while maintaining optimal weight distribution.

(*See* https://www.rawlings.com/product/DPWRBB5I3.html, (last visited July 5, 2025).)

iii.  USSSA Electric Unicorn 2025: marketed as receiving an "electrifying upgrade" that "isn't just about looks," with a "next-gen" barrel designed to "maximize barrel size, stiffness, and trampoline effect."



IN/TENSE CARBON COMPOSITE
Next-gen carbon composite maximizes barrel size, stiffness, and trampoline effect while maintaining optimal weight distribution.

Baseball's premier composite bat just got an electrifying upgrade. This is the 2025 Rawlings Icon Electric Unicorn. This limited-edition USSSA bat demands attention thanks to its bold pink and blue colorway, making it the most radiant bomb-crushing bat in the game.

But the Icon Electric Unicorn isn't just about looks. Thanks to our specially engineered In/Tense Carbon Composite material, the Icon delivers pop and consistency unlike any other two-piece composite bat in the field. The perfected Zero-Loss color delivers a seamless energy transfer through your swing and stabilizes the bat on any mishits, giving you the chance to slug for extra bases even when you don't get your A+ swing off.

(*See* https://www.rawlings.com/product/R00711156.html, (last visited July 5, 2025).)

48.  Defendant did not disclose to Plaintiff or other consumers which Icon models were approved based on representations that they had not materially changed. Records obtained from Washington State University indicate that certain Icon versions with material improvement claims were approved without new testing, while Defendant did not disclose that fact to consumers.

49.     Because Defendant exclusively controls certification submissions and related documentation, consumers were presented with a half-truth: Defendant marketed material and performance-related improvements to consumers while representing to certifying bodies that certain Icon models were materially unchanged.

50.     Had Plaintiff known that Defendant represented to governing bodies that versions of the Icon were materially unchanged from prior models, Plaintiff would not have purchased the bat or would have paid substantially less.

51.     Defendant's failure to disclose the basis for certification, combined with affirmative marketing of material improvements, misled consumers, including Plaintiff, and caused a price-premium injury.

### C.  Easton MAV-1

52.     Defendant's failure to disclose its certification representations is not limited to a single product line, but reflects a broader practice applied across its Brands, including Easton.

53.     In or around late 2024, Defendant released the 2025 Easton MAV-1 BBCOR baseball bat ("MAV1-25").

54.     Defendant marketed the MAV1-25 as materially different from prior MAV-1 models and emphasized changes to its construction and performance.

55.    For example, Defendant represented on its website that the MAV1-25 uses "new alloy processing" to create "thinner barrel walls," resulting in "maximum allowed performance."



(*See* https://easton.rawlings.com/product/EBB5MAV3.html,  (last visited February 19, 2026).)

56.    On information and belief, Defendant also provided marketing materials and product descriptions to third-party retailers, including Amazon.com, repeating claims that the





MAV1-25 included new features creating a "wider area of the barrel" and delivering "maximum performance."

(*See* https://www.amazon.com/Easton-Baseball-BBCOR-Barrel-Alloy/dp/B0DFD5FD6W?th=1 (last visited February 19, 2026).)

57.     Defendant offered both the 2025 MAV-1 and the 2024 version of the bat for sale on its website at different prices, reflecting a premium for the purported improvements in the2025 model.

58.     On information and belief, Defendant obtained certification for the MAV1-25 by representing to the certifying body that the bat had not materially changed from prior versions and did not require new performance testing.

59.     As with Defendant's other bat Brands and product lines, Defendant marketed the MAV1-25 as featuring material and performance-related improvements while failing to disclose how certification was obtained, creating a misleading half-truth that affected how consumers evaluated and priced the product.

### D.  Other Similar Claims

60.     On information and belief, Defendant employed the same nondisclosure practice across its bats, product lines, and Brands, pairing claims of material design improvements with the withholding of certification-pathway information.

61.     Additional examples of products marketed in this manner include, but are not limited to, the following:

    a.  2025 Rawlings CLOUT AI BBCOR, marketed as "back and better than ever" and as engineered with a "cutting-edge, patent-pending artificial intelligence design process" that "fine-tunes" each portion of the barrel to create "unbeatable performance."(*See* https://www.rawlings.com/product/RBB5C3.html, (last visited



Description      −

The game's most powerful BBCOR bat is back and better than ever: the 2025 Clout Ai is here to dominate the field! The Clout Ai is engineered with a cutting-edge, patent-pending artificial intelligence design process that creates unbeatable performance. Each quarter-inch of the barrel is fine-tuned to create complex contours that can't be replicated by traditional barrel design.

The result is a barrel that has perfect harmony between swing weight, responsiveness, and forgiveness. In other words: the perfect one-piece bat. In addition, the Clout Ai features a mid-load swing weight that delivers the powerful feel that elite hitters crave, and our RevGrip provides the perfect touch of cushion and tack to max out your swing speed.

    June 5, 2025).)

    b.  2025 Rawlings MACH AI BBCOR, marketed as a "first of its kind" bat featuring "refined technology and barrel design" with "patent-pending AI-generated barrel contours" that "optimize each quarter inch" of the barrel and a carbon composite

endcap designed to "generate faster swing speeds" and "elongate the sweet spot."



**ARTIFICIAL INTELLIGENCE - REAL RESULTS**

From the leaders in baseball innovation, Rawlings is once again changing the game and challenging everything you think you know about bat technology. Introducing the MACH AI bat – the first of its kind to offer artificial intelligence as a mechanism to enhance your offense. Given every swing is unique, the MACH AI's patent pending technology finely tunes performance inch by inch across the entire bat optimizing a larger portion of the barrel. Don't get left behind - get your Mach AI!

   

Description                                                    —

The 2025 Rawlings Mach Ai sports a bold new look to go along with refined technology and barrel design on the fastest bat in the game. On the inside of this bat, our patent-pending Ai-generated barrel contours optimize each quarter inch of the bat to acheive the perfect balance of pop, swing weight, and forgiveness to create a feel unlike any other hybrid bat.

In addition, the carbon composite endcap removes weight from the end of the bat so you can generate faster swing speeds without sacrificing any barrel mass. When paired with our premium RevGrip material, you can be sure you're getting every ounce of speed possible.

Get your Mach Ai today and uncover what faster swing speeds and Ai-generated barrel tech can do for your game!

(*See* https://www.rawlings.com/product/RBB5MC3.html, (last visited June 5, 2025).)

c. 2025 Rawlings Mantra Fastpitch, marketed as featuring a "revamped three-step design" with an inner barrel that "enhanced performance beyond the previous model's sweet spot," a "thinner outer layer for lower barrel compression" capable of producing "elite exit velocities," and a "fully reconstructed" connection joint

designed to improve bat speed and performance. (Visited June 2025, https://www.rawlings.com/product/RFP4M.html)

d.  2024 Easton Ghost Advanced, marketed as "The Most Advanced Bat In The Game," featuring "Third-generation Double Barrel construction" with Easton's "lowest compression outer barrel yet," a "highest-performing" composite, and a newly engineered ConneXion Evolution system designed to deliver "maximum allowed performance" and refined swing weight. (https://easton.rawlings.com/product/EFP4GHAD.html)

e.  2026 Easton Ghost Advanced, marketed as "The Most Advanced Bat In The Game" and "Get The Newest & Hottest Ghost Advanced," featuring "Third-generation Double Barrel construction" with Easton's "lowest compression outer barrel yet" and technology designed to deliver "maximum allowed performance."

f.   2025 Easton Hype Fire USSSA, marketed as "back, and better than ever" and "more than a makeover," with "optimizations to the Thermo-Composite technology," a "re-designed TCT barrel" engineered to "maximize sweet spot and performance," and refinements to the Opti-Flex handle and elastomer connector designed to increase exit velocity and barrel control.



(*See* https://easton.rawlings.com/product/EUT5HYP.html, (last visited February 19, 2026).)

g. 2025 Easton Rope BBCOR, marketed as incorporating a "new elastomer" in the center of the bat designed to reduce vibration and "amplify energy."



**CONNEXION MAX**
ConneXion Max technology amplifies energy transfer and offers an overall solid feel at contact. A new elastomer connector interlocks the handle to the barrel while eliminating vibration at contact.

(Visited June of 2025 at https://easton.rawlings.com/product/EBB5RPE3.html)

62. Any model marketed as featuring non-cosmetic, performance-affecting improvements while withholding the basis on which certification was obtained would mislead a reasonable consumer.

63. This uniform practice—pairing claims of material redesign with nondisclosure of certification pathway—raises common questions across Defendant's models, product lines, and Brands.

**E. Injury and Ongoing Harm**

64. Defendant's continued failure to disclose the basis on which its bats are certified prevents Plaintiff from determining whether current or future models marketed as redesigned or improved are consistent with Defendant's certification representations.

65. Plaintiff intends to purchase certified bats from Defendant in the future but cannot rely on Defendant's performance or redesign claims absent corrective disclosure.

66.    Without such disclosure, Plaintiff faces a real and immediate risk of future economic harm, including overpayment and the loss of truthful information material to his purchasing decisions.

### F.  Plaintiff Discovers Deceptive Behavior

67.    By marketing bats as featuring non-cosmetic improvements while, upon information and belief, representing to certifying bodies that certain models had not materially changed, Defendant concealed material facts and prevented reasonable consumers from discovering the truth before purchase.

68.    In or around January 2024, Plaintiff first suspected that Defendant was obtaining certification approvals based on representations of no material change while marketing the same models as materially or performance enhanced.

69.    Plaintiff thereafter reviewed Defendant's marketing materials and sought nonpublic records relating to certification and testing for the bats at issue, including through public records requests to Washington State University. Those records were produced in or around January 2025.

70.    Defendant's nondisclosure of its certification representations, combined with its exclusive control over testing and submission records, concealed material facts from consumers, including Plaintiff.

71.    Despite reasonable diligence, Plaintiff could not have discovered the misconduct earlier. He first suspected the practice in January 2024, and confirmation was not obtained until January 2025 through a public records request.

### G.  Notices of Breach Under UCC § 2-607

72.    In or around June 2025, shortly after discovering evidence suggesting that Defendant's performance and "new design" claims for the Bats may have been inconsistent with

its cosmetic-change submissions, Plaintiff notified Defendant and the authorized retailer in writing that the Bats were nonconforming and in breach of express warranties.

73.   Between June and August 2025, Plaintiff and Defendant exchanged communications regarding the alleged breach, including requests for repair, replacement, or refund and substantiation of the challenged performance claims.

74.   Defendant did not cure.

## CLASS ACTION ALLEGATIONS

75.   As authorized by Rule 23(b)(2) or (b)(3) of the Federal Rules of Civil Procedure, Plaintiff brings this action on behalf of a class of all other persons or entities similarly situated throughout the United States.

76.   Class Definition (Purchases-Based). Plaintiff brings this action on behalf of all persons in the United States who, from four (4) years before the filing of this Complaint through class certification, purchased any of the Bats.

77.   Plaintiff brings common-law claims on behalf of a nationwide class and, in the alternative, state subclasses.

78.    Plaintiff alleges that the core liability questions—whether Defendant made uniform misrepresentations/omissions about the bats and whether those misrepresentations/omissions caused economic injury—are materially uniform across states.

79.   To the extent any state's law is found to differ in a way that is material to class treatment, Plaintiff will seek certification of state-specific or logically grouped subclasses and/or issue classes under Rule 23(c)(4).

80.   Nothing in this pleading depends on the application of a single state's law to all class members; any conflicts can be addressed at class certification through subclassing and

tailored jury instructions.

81.    Uniform Conduct. Certification as a single class is appropriate because Defendant engaged in uniform marketing and nondisclosure that was either identical or substantially similar across all the Bats. For example, Defendant touted non-cosmetic enhancing feature changes while, upon information and belief, representing to regulatory bodies that certain models involved no material or physical design changes.

82.    Injury. Purchasers were uniformly injured by paying a price premium and/or receiving products that did not conform to Defendant's uniform representations.

83.    Exclusions. Excluded from the Class are Defendant and its officers/directors/employees/agents, counsel of record, the Court and its staff, and any person who timely and validly opts out.

84.    Ascertainability. Class membership is objectively determinable from SKU-level sales records maintained by Defendant and major retailers/distributors who sold the Bats.

85.    Numerosity. The proposed Class contains members so numerous that separate joinder of each member of the class is impractical. There are tens of thousands of proposed Class members based on the quantity and number of Bats sold.

### Commonality

86.    Questions of law and fact common to the Class include, without limitation:

  i.    whether Defendant made uniform non-cosmetic improvement claims about the Bats;

  ii.    whether Defendant failed to disclose their admission to regulatory bodies that Bats contained no non-cosmetic changes;

  iii.    whether a Cosmetic-Change approval disclaims material or physical design

changes and relies on prior test data;

iv.    whether, in light of (i)–(iii), Defendant's statements and omissions were false or misleading to a reasonable consumer;

v.    whether those statements/omissions were material;

vi.    whether the conduct caused class-wide price-premium (benefit-of-the-bargain) injury and the availability of common damages methodologies (e.g., hedonic regression/conjoint); and

vii.    whether injunctive and corrective-advertising relief is warranted.

## Typicality

87.    Plaintiff's claims are typical of the Class.

88.    Like other Class members, Plaintiff purchased one or more Bats during the Class Period after exposure to Defendant's uniform "new"/non-cosmetic improvement representations and nondisclosure of regulatory submissions representing no material or physical design changes.

89.    Plaintiff and the Class assert the same legal theories—fraud/misrepresentation (including half-truths), false advertising, and unjust enrichment—arising from the same course of conduct and alleging the same price-premium/benefit-of-the-bargain injury.

90.    Plaintiff seeks the same forms of relief as the Class, including damages, restitution, and injunctive and corrective-advertising relief.

## Adequacy

91.    Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff's interests are fully aligned with those of other Class members: all seek redress for the same uniform misrepresentations/omissions and the resulting price-premium/benefit-of-the-bargain injury.

92.     Plaintiff has no interests antagonistic to the Class and understands the fiduciary obligations owed to absent Class members.

93.     Plaintiff has retained counsel experienced in complex consumer and class litigation who will vigorously prosecute this action and has the resources to do so.

94.     Accordingly, Plaintiff and counsel will adequately represent the Class within the meaning of Rule 23(a)(4).

### Predominance and Superiority

95.     Predominance. Common questions predominate. Liability turns on Defendant's uniform "new"/non-cosmetic changes claims, its non-disclosure of its representation to governing bodies, and standardized approval protocols (including Cosmetic-Change submissions)—all provable with common evidence (archived product copy, catalogs, retailer listings, and governing-body approval records).

96.     The prosecution of separate actions by individual members of the proposed Class would create a risk of inconsistent or varying adjudication with respect to individual members, which would establish incompatible standards for the parties opposing the class.

97.     Common Injury & Damages. Whether this conduct misled a reasonable consumer, was material, and caused a price-premium/benefit-of-the-bargain injury are common questions. Classwide damages are measurable from transaction-level pricing using accepted methods such as hedonic regression (and, where appropriate, conjoint analysis).

98.     Superiority. A class action is superior to individual suits because separate actions would be impractical, risk inconsistent outcomes, and duplicate discovery on the same marketing and approval records; concentrating the claims in one forum promotes efficiency, and no unusual manageability issues are expected.

99.    Rule 23(b)(2) — Injunctive/Declaratory Relief. Defendant has acted on grounds generally applicable to the Class by pairing "new"/non-cosmetic change claims with non-disclosure of their admissions to governing bodies. Defendant can readily implement corrective disclosures, making injunctive and corrective-advertising relief appropriate under Rule 23(b)(2).

## FIRST CAUSE OF ACTION
### (Unjust enrichment)

100.    Plaintiff alleges this claim individually and on behalf of the Class.

101.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

102.    Plaintiff and Class members conferred a monetary benefit on Defendant by purchasing the Bats, a portion of which was paid to or retained by Defendant through its sales channels and pricing decisions.

103.    Defendant knew of, appreciated, and accepted this benefit.

104.    It would be inequitable for Defendant to retain the benefit because Defendant's uniform marketing of non-cosmetic, performance-affecting improvements, coupled with its failure to disclose the basis on which certification was obtained, created a misleading net impression and induced consumers to pay a price premium.

105.    As a direct and proximate result, Plaintiff and the Class suffered economic injury, including price-premium overpayment and diminished value.

106.    Plaintiff brings this unjust-enrichment claim in the alternative to legal claims, including to the extent any contract is found not to govern the subject matter, is void or unenforceable, or does not afford complete relief.

107.    Plaintiff and the Class seek restitution and disgorgement of the unjust benefits retained by Defendant, together with pre- and post-judgment interest, and such other equitable

relief as the Court deems just and proper, including, if appropriate, a constructive trust over monies wrongfully retained.

## SECOND CAUSE OF ACTION
### (Negligent Misrepresentation)

108.   Plaintiff brings this claim individually and on behalf of the Class.

109.   Plaintiff incorporates the foregoing allegations as if fully set forth herein.

110.   In the course of its business, Defendant supplies detailed technical product specs and performance metric information for the guidance of purchasers in business transactions—including on product packaging, its website, and materials provided to authorized retailers—regarding the nature and performance of the Bats.

111.   Defendant represented that the Bats were "new," "redesigned," "improved," "next-gen," and otherwise technically altered in ways that guided purchasers looking for "bigger barrels," "lighter swings" feels, or "maximum allowable performance."

112.   Upon information and belief, Defendant represented in certification submissions for certain models that no material or physical design changes had been made, and failed to disclose those representations to consumers.

113.   These misrepresentations created a misleading net impression and failed to supply complete information for the guidance of consumers.

114.   Defendant had a duty, as a supplier of information for the guidance of consumers in commercial transactions, to exercise reasonable care in communicating complete and accurate information regarding the design and performance of the Bats.

115.   Defendant had superior and exclusive knowledge of its design and certification records and failed to exercise reasonable care or competence in obtaining or communicating the information described above.

116.    Plaintiff and Class members justifiably relied on Defendant's uniform technical product-performance claims and, absent any disclosure to the contrary, reasonably believed Defendant's regulatory submissions were consistent with the outcomes it touted.

117.    As a direct and proximate result, Plaintiff and the Class suffered pecuniary loss, including payment of a price premium, diminished product value, and loss of the benefit of the bargain. Had the true facts been known, Plaintiff would not have purchased the Bats or would have paid less.

118.    Plaintiff seeks actual damages and all other relief permitted by law, together with pre- and post-judgment interest.

## THIRD CAUSE OF ACTION
### (Fraudulent Misrepresentation)

119.    Plaintiff brings this claim individually and on behalf of the Class and incorporates the foregoing allegations.

120.    Particularity. As detailed herein, Defendant authored, approved, and disseminated the challenged statements on its website, catalogs, product packaging, and retailer-facing materials during the marketing cycle for its Bats. The statements appeared at the identified URLs during the class period and were false or misleading for the reasons set forth below.

121.    False statements. Defendant represented that the Bats were "new," "improved," or "next-gen," and possessed otherwise non-cosmetic performance-enhancing physical changes from previous versions, while failing to disclose that, upon information and belief, Defendant represented in certification submissions that certain models had not materially changed.

122.    These non-cosmetic claim statements were false or misleading, or were made with reckless disregard for whether they were consistent with Defendant's certification representations.

123.    Materiality. The existence of new, performance-affecting physical changes—and whether Defendant represented in certification submissions that no such changes had occurred—were material to reasonable consumers and to Plaintiff's purchasing decisions.

124.    Price premium. Bat models bearing the challenged claims commanded higher prices than both prior-year models and alternative bats, often by hundreds of dollars; in some cases, consumers are induced to replace their current bat with a "new" bat that is, undisclosed to them, relying on the very certification of the bat they already own—reflecting a price premium attributable to Defendant's representations, which Plaintiff paid.

125.    Older model bats lacking the purportedly "new" or "improved" characteristics were sold at significantly lower prices, reinforcing the price premium attributable to Defendant's representations.

126.    Defendant knew or recklessly disregarded that its statements were false or misleading.

127.    Intent. Defendant made and disseminated its misstatements and/or misrepresentations with the express purpose and/or intent to mislead consumers and to have consumers rely on their misrepresentations and misstatements when purchasing the Bats.

128.    Reliance. Plaintiff saw and relied on the statements identified herein before purchasing the Bats and would not have purchased—or would have paid less—but for Defendant's misrepresentations and omissions.

129.    Damages. As a direct and proximate result, Plaintiff and the Class suffered economic loss, including payment of a price premium, diminished value, and loss of the benefit of the bargain.

130. Defendant's conduct was willful and malicious, intentionally fraudulent, or, at minimum, undertaken with knowing and reckless indifference to Plaintiff's rights, warranting punitive damages sufficient to punish and deter such misconduct.

**FOURTH CAUSE OF ACTION**
**(Breach of Express Warranty — U.C.C. § 2-313)**

131. Plaintiff realleges and incorporates the foregoing paragraphs.

132. Defendant made affirmations of fact and promises regarding the Bats' characteristics and performance, including claims that the Bats were "new," "improved," "redesigned," "next-gen," and otherwise contained performance-affecting physical or material changes (e.g., "new alloy processing," "thinner barrel walls," "fully reconstructed" or "redesigned" connection components, "enhanced" end caps, and similar statements), through product packaging, its websites, catalogs, and retailer-facing materials.

133. These affirmations of fact became part of the basis of the bargain, creating express warranties that the Bats would conform to the stated performance-affecting features.

134. The Bats did not conform to these express warranties, including where, upon information and belief, Defendant obtained or maintained certification through Cosmetic-Change submissions representing that no material or physical design changes had occurred, contrary to the "new" and performance-related representations made to consumers.

135. Plaintiff and Class members purchased the Bats in reasonable reliance on these affirmations and would not have purchased, or would have paid less, absent the warranties.

136. Defendant received timely notice of the breach, including through pre-suit communications and/or this complaint, and is not prejudiced by any additional notice. See U.C.C. § 2-607(3)(a).

137.    As a direct and proximate result, Plaintiff and the Class suffered economic damages, including price-premium overpayment, diminished value, and loss of the benefit of the bargain.

138.    Plaintiff and the Class seek benefit-of-the-bargain damages, incidental and consequential damages where permitted, rescission or restitution where appropriate, pre- and post-judgment interest, and any other relief the Court deems just and proper.

139.    This claim is pled in addition to and not in lieu of Plaintiff's statutory and tort claims; to the extent privity is challenged, Plaintiff alleges that Defendant's consumer-directed affirmations and uniform marketing create enforceable express warranties under Utah law.

## JURY DEMAND

Plaintiffs demand a jury trial on all issues so triable.

## PRAYER FOR RELIEF

Wherefore, Plaintiff prays for relief and judgment against Defendant as follows:

I.    Certification of the asserted claims as a nationwide class and, to the extent required, state or grouped subclasses and/or issue classes under Rule 23, appointment of Plaintiff as class representative, and appointment of class counsel;

II.    Judgment in favor of Plaintiff and the Class on all causes of action;

III.    Compensatory damages (including price-premium/benefit-of-the-bargain damages) in an amount to be proven at trial;

IV.    Restitution, disgorgement, and other equitable relief as permitted by law (including, if appropriate, imposition of a constructive trust);

V.    Injunctive and declaratory relief requiring corrective disclosure regarding certification pathways and performance representations;

VI.     Punitive damages as allowed by law;

VII.     Pre- and post-judgment interest;

VIII.     Reasonable attorneys' fees, costs, and expenses as allowed by law; and

IX.     Such other and further relief as the Court deems just and appropriate.

DATED this 20th day of February, 2026.

RAY QUINNEY & NEBEKER

*/s/ Kennedy D. Nate*
Kennedy D. Nate
*Attorney for Plaintiff*